IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAWANDA MARIE DAVIS, | ) | CASE NO. 5:19-CV-2742 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lawanda Marie Davis ("Davis") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 17.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Davis filed applications for DIB and SSI in August 2016, alleging a disability onset date

of February 2, 2016.  Tr. 188, 192.  She alleged disability based on a wedge compression fracture

in her back at T-10.  Tr. 231.  After denials by the state agency initially (Tr. 79, 80) and on

reconsideration (Tr. 103, 104), Davis requested an administrative hearing (Tr. 128).  A hearing

was held before an Administrative Law Judge ("ALJ") on August 14, 2018.  Tr. 27-53.  In her

October 9, 2018, decision, the ALJ determined that Davis can perform some of her past relevant

work as well as other jobs that exist in significant numbers in the national economy, i.e. she is

not disabled.  Tr. 20-22.  Davis requested review of the ALJ's decision by the Appeals Council

1

(Tr. 186) and, on September 23, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Davis was born in 1968 and was 48 years old on the date she filed her applications.  Tr. 188.  She graduated from high school and had some college.  Tr. 33.  She previously worked as a retail assistant manager, cashier, hospital housekeeper, and resident support aide, and she last worked in January 2016.  Tr. 31, 34, 46.

### B. Relevant Medical Evidence

On January 19, 2016, Davis injured her back when she lifted a bed while working as a housekeeper.  Tr. 391.  Later that day she saw Dr. Desai, M.D., at Summa Health.  Tr. 391-392.  She appeared to be in discomfort and moved very slowly.  Tr. 391.  She had tenderness along her thoracic and lumbar spine and normal strength and sensation.  Tr. 392.  Dr. Desai recommended conservative treatment (heat, ice, rest, over-the-counter medication), emphasized that she should continue to move around, and stated that she could return to work with restrictions.  Tr. 392.  She was ordered to return in one week for a follow up.  Tr. 392.  On a separate worker's compensation form, Dr. Desai checked a box indicating that the work limitations were temporary and that Davis could stand or walk for four hours apiece with breaks, sit for eight hours with breaks, may sit or stand as needed for comfort, and should not lift or adopt various postures.  Tr. 305.

On January 25, Davis returned to Dr. Desai and reported no improvement in her symptoms and that she had developed right leg pain.  Tr. 387.  She was performing light duty work, taking breaks, and taking Tylenol; she was not using ice or heat and she was sleeping in a

recliner.  Tr. 387.  Upon exam, she appeared to be in discomfort, had tenderness upon palpation, a positive straight leg raise test, reduced range of motion in her back with discomfort, and normal balance and strength.  Tr. 387.  Dr. Desai ordered an MRI and recommended a trial of physical therapy and ice.  Tr. 387.  She issued a second, temporary, worker's compensation statement, which reduced standing and walking to one hour apiece with breaks and indicated that Davis would need additional breaks.  Tr. 389.  Dr. Desai estimated that she should be able to return to her job by February 9, 2016.  Tr. 389.

A thoracic MRI taken January 29 showed a remote anterior wedge compression fracture at T10, facet osteoarthritis on the right at T7-8 contributing to spinal canal stenosis but no cord compression.  Tr. 298-299.  A lumbar MRI showed a mild annular disc bulge at L5-S1.  Tr. 300.

Beginning February 2, 2016, until October 2016, certified nurse practitioner Noelle Bothe and Dr. Goff, M.D., at Summa Health issued a series of worker's compensation forms with off-work restrictions.  Tr. 308-325, 332-333, 351-52.  Each form indicated that the restrictions were temporary.

On February 17, 2016, Davis saw her primary care physician, Dr. Laszlo, M.D., for a preventative exam and knee pain that she had had for the last year that was worsening.  Tr. 445, 449.

On March 23, 2016, Davis saw Dr. Tharp, D.O., for an orthopedic spine evaluation.  Tr. 264.  She complained of mid-back pain and some right leg pain.  Tr. 264.  She was 64.5 inches tall and weighed 259 pounds.  Tr. 266.  Dr. Tharp assessed her with sprain of ligaments of thoracic spine, strain of muscle and tendon of back wall of thorax, sprain of unspecified parts of lumbar spine and pelvis, and wedge compression fracture of tenth thoracic vertebra.  Tr. 266.  He

did not recommend surgery, gave Davis a prescription for physical therapy, and recommended she continue to take anti-inflammatories.  Tr. 267.

On June 23, 2016, Davis saw Dr. Donich, M.D. for a second orthopedic evaluation.  Tr. 304.  She complained of low back pain radiating to her right leg.  Tr. 304.  Dr. Donich discussed the possibility of cementing her T10 vertebra or conservative care (wearing a back brace), with Davis opting for the brace.  Tr. 304, 297.

On August 8, 2016, Davis returned to Dr. Donich reporting that her pain was not much better with the brace.  Tr. 294.  She stated that her pain was aggravated by bending, prolonged sitting, standing, and walking.  Tr. 294.  Dr. Donich recommended physical therapy.  Tr. 295.

On November 21, 2016, Davis saw Nurse Bothe at Summa Health.  Bothe listed her assessments (thoracic sprain and lumbar sprain), stated that Davis' worker's compensation claim had been disallowed, and reported that she would pursue treatment through a pain management provider.  Tr. 326-327.  The same day, Bothe and Dr. Goff completed their last worker's compensation form releasing Davis to work because her allowed conditions for worker's compensation had resolved.  Tr. 328-329.  The form indicated that Davis would need to have her primary care provider or pain management provider designate restrictions for her thoracic T10 fracture.  Tr. 328.

On January 18, 2017, Davis saw Dr. Ali, M.D., for pain management.  Tr. 436-437.  She rated her pain 9/10.  Tr. 436.  Upon exam, she had a body mass index of 46.3, mild thoracic spinal tenderness increased with extension and rotation, normal sensation and gait, negative straight leg raise testing, and no significant weakness.  Tr. 437.  Dr. Ali stated, "She does have an old compression fracture unlikely due to work-related injury."  Tr. 437.  He remarked that her pain was mainly myofascial and that her morbid obesity and smoking were not helping.  Tr. 437.

He started her on a low dose of Tramadol for pain and she was to follow up in two months.  Tr. 437.

On July 27, 2017, Davis saw chiropractor Coffey, D.C., and stated that her pain interfered with walking and housework.  Tr. 422.  She received a lumbar spine manipulation.  Tr. 422.

On August 9, 2017, Davis returned to pain management and saw physician's assistant Carpenter.  Tr. 419.  She reported 10/10 pain in her low back and also that her right lower extremity occasionally felt unsteady.  Tr. 419.  She reported that chiropractic work had not been very effective.  Tr. 419.

On September 8, 2017, Davis saw Dr. Ali and reported a 10/10 pain level in her lower back and was experiencing 30% pain relief with medication.  Tr. 415.  She reported that physical therapy and non-steroidal anti-inflammatory medication (NSAIDS) had not helped.  Tr. 416. Upon exam, she had mild thoracic spine tenderness increased with extension and rotation, wore a back brace, had a normal gait and was able to stand on her heels and toes with little difficulty, normal sensation, negative straight leg raise testing, and no significant weakness.  Tr. 416.  She was assessed with other intervertebral disc degeneration in the lumbar region, low back pain, myalgia, chronic pain syndrome, obesity, tobacco use, and pain in thoracic spine.  Tr. 416.  Her medications (Robaxin, Tramadol) were refilled and she was to follow up in two months, but she did not attend her next appointment.  Tr. 416, 479.

### C. Opinion Evidence-State Agency Reviewing Physicians

On October 19, 2016, state agency reviewing physician Dr. March, D.O., reviewed Davis' file and opined that she could perform work at the light exertional level with some postural limitations due to her back pain and degenerative changes in her spine.  Tr. 65-66.  She should also avoid all hazards and commercial driving.  Tr. 66.  On February 14, 2017, Dr. Bolz,

M.D., adopted Dr. March's opinion.  Tr. 87-88.

### D. Testimonial Evidence

#### 1. Davis' Testimony

Davis was represented by counsel and testified at the administrative hearing.  Tr. 29.  She testified that she lives in a house with her teenaged son and godmother.  Tr. 32.  She has a driver's license and is able to drive.  Tr. 32-33.  She had stopped working prior jobs that she had held in the past to care for her mother, who had been ill.  Tr. 34-35.  While performing her most recently held job in January 2016, she injured her back.  Tr. 36.  She has not been able to find a job since then that she can perform because she can't walk too long or sit too long.  Tr. 37.  The most she can sit or walk is an hour to an hour and 30 minutes.  Tr. 37.  When she stands for too long she leans due to pain in her back, and when she gets ready to walk her left leg goes limp.  Tr. 37.  When she has been sitting, she stands up, tries to stretch a little, then tries to walk some.  Tr. 38.  When she is walking in the house she tries to be close to a chair in case her left leg fails her.  Tr. 38.  She tries to do things while she is sitting, like folding clothes.  Tr. 38.

Her back pain feels like a sharp pain that shoots down her left leg.  Tr. 43.  When she tries to walk, her left leg buckles.  Tr. 43.  This happens quite often when she is moving around a lot trying to clean.  Tr. 43.  She lies down a lot during the day, on the couch or her bed.  Tr. 43.

For treatment for her back, she has been using a TENS unit and wearing a back brace.  Tr. 38.  Her back feels better with the brace due to the pressure it applies.  Tr. 38.  She wears it when she is working around the house to try to prevent the pain from occurring.  Tr. 38-39.  She stopped going to pain management because they said there was really nothing that they could do.  Tr. 39.  She tried water therapy but stopped because it caused pain when she was in the water and she didn't feel any better when she came out of the water.  Tr. 39-40.  Now she takes over-

the-counter medications and uses heating patches.  Tr. 40.  Using the heating patches and wearing the back brace helps a little.  Tr. 40.  But nothing really helps too much because when she is trying to sleep at night, the pain causes her to toss and turn trying to get comfortable and she doesn't get to sleep until about 4 a.m.  Tr. 40.  The pain feels thumping, like a toothache.  Tr. 50.

On a typical day, Davis gets up in the morning, takes a bath, gets dressed, and goes downstairs.  Tr. 40.  She sits for about five minutes then starts making breakfast.  Tr. 40.  After she eats breakfast she will sit down again, and then she will wash dishes.  Tr. 41.  She will try to clean one room; it used to take her 15 minutes but now it takes her an hour.  Tr. 41.  She tries not to push herself because the more she pushes herself the worse pain she experiences at night.  Tr. 41.  She is able to stand while making everyday meals, but during the holidays she can't stand and cook like she used to; she has to sit the majority of the time.  Tr. 41.  She has to get help to lift a heavy pan or to get something out of the oven.  Tr. 41-42.

Davis goes grocery shopping with her son and he carries the heavier items.  Tr. 42.  He carries the bags to the car and into the house.  Tr. 42.  He carries the laundry down into the basement and she will go down and do laundry; she tries to stay downstairs so she doesn't have to keep going up and down the steps.  Tr. 42.  She doesn't do yard work and what she can't do around the house her kids or grandkids will help her do.  Tr. 44.  She can drive but she can't drive long distances anymore.  Tr. 44.  She can drive one or two hours and push herself to three hours, but it she drives more than three hours she needs to take a break.  Tr. 44.  When she goes on 8-hour family trips, she stops more than she used to.  Tr. 44.  When she has had an active day, the next morning she can't get out of bed until noon, whereas otherwise she is up a nine or ten a.m.  Tr. 45.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 45-51.  The ALJ discussed Davis' past work history as a retail assistant manager, cashier, hospital housekeeper, and home attendant.  Tr. 46.  The ALJ asked the VE to determine whether a hypothetical individual of Davis' age, education and work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform Davis' past work of assistant manager and cashier, and that she could also perform the following additional jobs with significant numbers in the national economy: food service worker, sales attendant, and hotel housekeeper.  Tr. 46-47.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her October 9, 2018, decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2018. Tr. 17.

2.    The claimant has not engaged in substantial gainful activity since February 2, 2016, the alleged onset date. Tr. 17.

3.    The claimant has the following severe impairments: Degenerative disc disease of the thoracic and lumber spines, status post compression fracture at T-10 vertebra, and

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

obesity.  Tr. 17.

4.  The claimant does not have an impairment or combination of impairments that meets or
    medically equals any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.  Tr.
    17.

5.  The claimant has the residual functional capacity to perform light work as defined in 20
    CFR 404.1567(b) and 416.967(b), except that she cannot climb ladders, ropes, or
    scaffolds, and she cannot work at unprotected heights or with moving mechanical parts.
    The claimant can frequently climb ramps/stairs, and she can occasionally stoop, kneel,
    crouch, and crawl.  Tr. 18.

6.  The claimant is capable of performing her past relevant work of Cashier, and of
    Assistant Manager.  This work does not require the performance of work related
    activities precluded by the claimant's residual functional capacity.  Although the
    claimant is capable of performing past relevant work, the undersigned makes the
    alternative findings for step five of the evaluation process:[….there are jobs that exist in
    significant numbers in the national economy that the claimant can perform].  Tr. 20-22.

7.  The claimant has not been under a disability, as defined in the Social Security Act, from
    February 2, 2016, through the date of this decision.  Tr. 22.

## V. Plaintiff's Arguments

Davis argues that the ALJ violated the treating physician rule, failed to adequately

explain her assessment of the state agency reviewing physicians' opinions and Davis' statements

regarding her symptoms, and erred when relying on VE testimony.  Doc. 13.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err with respect to the opinion evidence

Davis argues that the ALJ violated the treating physician rule because she did not evaluate the opinions of Drs. Goff and Desai.  Doc. 13, p. 8.  She asserts, "there is no discussion of the rationale for either adopting or discounting the opinions of the treating sources."  Doc. 13, p. 20.  Defendant contends that Drs. Goff and Desai are not Davis' treating physicians and that the ALJ adequately explained why she discounted their opinions.  Doc. 16, pp. 7-12.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  *See* 20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40

F.3d 789, 794 (6th Cir. 1994)).

The plaintiff has the burden of showing that a doctor is a treating physician.  *See id*. at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four).  Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec*., 482 F.3d 873, 876 (6th Cir. 2007)).  A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."  *Smith*, 482 F.3d at 876.

Davis does not show (or even assert, in her reply brief) that Drs. Goff and Desai were her treating physicians.  The record does not indicate that either doctor was her treating physician.  Dr. Desai first saw Davis hours after her injury and once the following week; she issued work restrictions on both days.  This is not evidence of an "ongoing treatment relationship."  20 C.F.R. § 404.1502; *Kornecky*, 167 Fed. App'x at 507.  And there are no records indicating that Dr. Goff ever saw Davis.[2]  Because neither doctor was her treating physician, the treating physician rule does not apply.

The ALJ considered the work restrictions issued by Drs. Goff and Desai.  She noted that Davis was released to light duty within a month of her injury.  Tr. 18, 20.  While the ALJ did not name Dr. Desai as authority for this restriction, Dr. Desai released Davis to working with restrictions within a month of her injury.  See Tr. 305, 389.  As for Dr. Goff's restrictions, the

---

[2]  The record indicates that Davis saw Nurse Bothe during her visits to Summa Health.  See. Tr. 361.

ALJ wrote,

> While Dr. Goff and NP Bothe have provided the claimant with serial "off work" orders, these orders were all temporary in nature, pending orthopedic or other assessments, and these completed assessments simply do not support the finding that the claimant's spinal impairment has precluded all work activity since February 2016.  The undersigned therefore accords these opinions little weight in the determination of this matter.

Tr. 20.  Earlier in the opinion, the ALJ had detailed the completed assessments that Davis underwent, including the following: the February and March 2016 visits with orthopedic surgeon Dr. Tharp, who found normal exam findings other than tenderness with palpation and a slow, antalgic gait; who opined that she was not a surgical candidate; and who recommended conservative treatment of physical therapy and anti-inflammatories.  Tr. 19.  The ALJ discussed Davis' second evaluation in June 2016 by orthopedic surgeon Dr. Donich, who found she had a moderately impaired back range of motion; offered a surgical option or a back brace, and Davis had opted for the back brace; and who had recommended physical therapy, but Davis had opted for pain management instead.  Tr. 19-20.  Finally, the ALJ detailed Davis' subsequent visit to pain management with Dr. Ali, who found generally normal exam findings (normal gait, strength, sensation); agreed with Dr. Tharp that Davis' "old compression fracture [was] unlikely due to [her] work-related injury"; concluded that her mild tenderness over her thoracic spine that increased with extension and rotation was mostly myofascial; and started her on a low dose of medication.  Tr. 20.  The ALJ noted that Davis' exam findings remained essentially unchanged since her initial visit and that she was last seen in September 2017, almost one year prior to her hearing.  Tr. 20; see also Tr. 30-31 (hearing transcript dated August 14, 2018 in which counsel indicates that there are no new medical records to submit; Davis had stopped going to pain management; and she was taking over-the-counter medications to manage her pain); 39-40 (testimony).  In other words, the ALJ discussed her rationale for discounting Dr. Goff's opinion.

13

Moreover, the ALJ's statement that Dr. Goff's "off work" restrictions were "temporary" is accurate and a sound basis for discounting an opinion.  Although Dr. Goff's temporary restrictions were issued over a nine-month period, they fall short of totaling a 12-month period of disability.  *See* 20 C.F.R. § 416.905(a) ("Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment … which has lasted or can be expected to last for a continuous period of not less than 12 months.");  *Andres v. Comm'r of Soc. Sec.*, No. 3:16-cv-991, 2017 WL 3447849, at *14 (N.D. Ohio July 11, 2017)[3] (the ALJ did not err when discounting temporary restrictions that did not add up to a 12-month period).

Next, Davis asserts that the ALJ failed to address the findings of pain and Davis' MRI results.  Doc. 13, p. 12.  However, the ALJ addressed the findings of pain and Davis' MRI results.  Tr. 18 (MRI); Tr. 19 (pain).

Finally, Davis complains that the ALJ did not discuss the weight she gave to the state agency reviewers' opinions or which part of the findings she adopted.  Doc. 13, pp. 9-10.  But the ALJ stated that she gave "weight" to the state agency reviewers' opinions that Davis had the capacity to perform a range of light work and that her RFC assessment was in accord with those conclusions.  Tr. 20.  Indeed, the ALJ's RFC was in accord with the state agency reviewers' RFCs, and even slightly more restrictive.  See Tr. 65-66, 98-99 (state agency reviewers' opinions that Davis can perform light work; frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds and stoop, kneel, and crawl; and must avoid all exposure to hazards and commercial driving); Tr. 18 (ALJ's RFC finding that Davis can perform light work; frequently climb ramps and stairs; never climb ladders, ropes and scaffolds; occasionally stoop, kneel,

---

[3] *Report and recommendation adopted*, 2017 WL 3438550, at *1 (N.D. Ohio Aug. 10, 2017); *aff'd*, 733 F. App'x 241 (6th Cir. 2018).

crouch and crawl; and must avoid unprotected heights and moving mechanical parts).  Davis

argues that the ALJ did not explain why his RFC varied slightly from the state agency reviewers'

RFC.[4]  Doc. 13, pp. 9-10; Doc. 18, p. 2.  But an ALJ is not required to adopt, verbatim, a

medical source's opinion.  *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir.

2009) (The responsibility for determining a claimant's residual functional capacity rests with the

ALJ, not a physician, and the ALJ "is not required to recite the medical opinion of a physician

verbatim in his residual functional capacity finding." ); *Reeves v. Comm'r of Soc. Sec.* 618, Fed.

App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion,

there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is

the ALJ required to adopt the state agency psychologist's limitations wholesale.").  Thus, the fact

that the ALJ did not adopt the state agency reviewers' opinions verbatim is not error.  *Id.*

### B. The ALJ did not err with respect to Davis' obesity

Davis argues that he ALJ erred "when she failed to address and/or consider the effects of

Davis' obesity on her musculoskeletal problems."  Doc. 13, p. 13.  She asserts, "Contrary to the

ALJ's brief statement that there was no evidence to support a finding that her weight caused or

contributed to 'listing-level musculoskeletal or other systemic dysfunction', Dr. Ali opined that

her morbid obesity did not help her back pain (Tr. 426)."  Doc. 13, p. 13.

An ALJ must consider the claimant's obesity, in combination with other impairments, at

all stages of the sequential evaluation.  *See Miller v. Comm'r of Soc. Sec.*, 811 F. 3d 825, 835

(6th Cir. 2016); SSR 02-1p, 2002 WL 34686281, *3-4 (obesity will be considered at all stages of

---

[4]  Defendant points out that the ALJ omitted the limitation found in the state agency reviewers' opinions regarding commercial driving, and that, elsewhere in her decision, the ALJ had remarked that Davis is able to drive and does drive.  Doc. 16, p. 13 (citing Tr. 20, 44 (Hearing testimony in which Davis stated that she can drive one to two hours; push herself to drive three hours at a time; and that, if she drives more than three hours at a time, she needs to take a break)).

the sequential evaluation and is evidenced by a diagnosis of obesity or treatment notes from an examining physician listing the claimant's height, weight and appearance, and when it appears in the record in a consistent pattern).  However, "[i]t is a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants."  *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411-412 (6th Cir. 2006).

Here, the ALJ found Davis' obesity to be a severe impairment.  Tr. 17.  At step three, the ALJ considered Davis' obesity; accurately stated that obesity is not a listed impairment; recognized that SSR 02-1p and Listing 1.00Q contemplates that obesity may cause or contribute to listing level musculoskeletal or other systemic dysfunction; and concluded, "there is no evidence to support such a finding in this case."  Tr. 18.  While true that Dr. Ali commented that Davis' obesity did not help her back pain (Tr. 426), the ALJ acknowledged that Dr. Ali commented that both Davis' obesity and her smoking were not helping her back pain.  Tr. 20.  But Dr. Ali did not provide an opinion regarding functional limitations; nor did any other provider assess limitations due to Davis' obesity.  *See Essary v. Comm'r of Soc. Sec*., 114 Fed. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity."); *c.f. Shilo v. Comm'r of Soc. Sec*., 600 F. App'x 956, 962 (6th Cir. 2015) (the ALJ erred when failing to consider the claimant's obesity despite the presence of multiple opinions in the record detailing numerous functional limitations caused by the claimant's obesity).  Davis herself did not testify that her obesity caused limitations.  *See Essary*, 114 Fed. App'x at 667 (citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting claim that the ALJ erred in failing to consider obesity when assessing an RFC; "Although his treating doctors noted that [the claimant] was obese and should lose weight, none

of them suggested his obesity imposed any additional work-related limitations, and he did not

testify that his obesity imposed additional restrictions.").

Moreover, as the ALJ observed, Dr. Ali had found Davis to have generally normal exam

findings (normal gait, strength, and sensation); agreed with Dr. Tharp, Davis' orthopedic

surgeon, that her T-10 fracture was old and unlikely caused by her work injury in January 2016;

found her to have only mild tenderness upon palpation that increased with extension and

rotation; and concluded that her pain was mostly myofascial.  Tr. 20.  Davis does not identify

evidence that a provider opined that she had a listing-level musculoskeletal or other systemic

dysfunction due to her obesity, or work-related limitations due in whole or in part to her obesity.

The ALJ did not err with respect to Davis' obesity.

### C. The ALJ did not err when she relied on VE testimony

Davis argues that ALJ erred when she found that Davis could perform her past work as a

cashier and assistant manager and when she found that, alternatively, she could perform other

jobs in the national economy.  Doc. 13, p. 14.  The basis for Davis' argument is that the ALJ's

hypothetical presented to the VE was insufficient because it contained the restrictions

subsequently assessed in the ALJ's RFC determination.  However, because the ALJ's RFC

determination was not erroneous, the ALJ's reliance upon the VE's testimony regarding the jobs

that Davis could perform is not error.

### D. The ALJ did not err when assessing Davis' allegations regarding her symptoms

Davis argues that the ALJ erred when assessing her credibility.  Doc. 13, p. 16.  A

claimant's statements of pain or other symptoms alone are not sufficient to establish the

existence of a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p,

2017 WL 5180304.  When a claimant alleges impairment-related symptoms, a two-step process

is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); 2017 WL 5180304, *2-8.
First, a determination is made as to whether there is an underlying medically determinable
physical or mental impairment that could reasonably be expected to produce the claimant's
symptoms, e.g., pain.  *Id*., *3-4.  Second, once the foregoing is demonstrated, an evaluation of
the intensity and persistence of the claimant's symptoms is necessary to determine the extent to
which the symptoms limit the claimant's ability to perform work-related activities.  *Id*. at *3, 5-8.
To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along
with the objective medical evidence, information from medical and non-medical sources,
treatment received, and other evidence.  *Id*.  In addition to this evidence, the factors set forth in
20 C.F.R. 404.1529(c)(3) are considered: daily activities; location, duration, frequency, and
intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type,
dosage, effectiveness, and side effects of any medication taken to alleviate pain or other
symptoms; treatment, other than medication for relief of pain or other symptoms; measures other
than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back;
and any other factors pertaining to a claimant's functional limitations and restrictions due to pain
or other symptoms.  *Id*. at *7-8.  The ALJ's decision "must contain specific reasons for the
weight given to the individual's symptoms, be consistent with and supported by the evidence,
and be clearly articulated so the individual and any subsequent reviewer can assess how the
adjudicator evaluated the individual's symptoms."  *Id*. at *10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great
weight and deference, particularly since an ALJ is charged with the duty of observing a witness's
demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be
supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec*., 437 Fed. App'x 370, 371

(6th Cir. 2011) (citing *Walters*, 127 F.3d at 531).

Davis asserts that the ALJ "disregarded any evidence which would have supported Davis' testimony regarding her limitations." Doc. 13, p. 18.  In support of her assertion, she cites the January 2016 thoracic and lumbar spine MRIs which showed a mild annular disc bulge at L5/S1 without significant stenosis or foraminal encroachment that the ALJ "erroneously ignored." Doc. 13, p. 18.  Davis is mistaken; the ALJ considered the findings in both MRIs.  Tr. 18.  Davis accuses the ALJ of "playing doctor" and "seeking any justification for a finding that Davis was not disabled."  Doc. 13, p. 18.  To the contrary, the ALJ's RFC assessment was more restrictive than any opinion evidence in the record.

Davis offers no other reasons as to why she believes the ALJ erred when assessing her statements regarding her pain and other symptoms.  She has not, therefore, identified an error on the part of the ALJ.  Accordingly, the ALJ's decision is affirmed.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision **AFFIRMED**.


IT IS SO ORDERED.


Dated: October 20, 2020

*/s/Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge